**LANDRO v. PACIFIC ATLANTIC S. S. CO.**

**No. 13920.**

District Court, W. D. Washington, N. D. Nov. 27, 1937.

S. Levinson and J. Friedman, both of Seattle, Wash., for libellant.

Bogle, Bogle & Gates, of Seattle, Wash., for respondent.

NETERER, District Judge.

On September 13, 1937, Libellant with other members of the crew signed shipping Articles on the S. S. San Angelo for a voyage from the port of Seattle to the port of Philadelphia and return to Pacific coast port, to which was added the following rider: "In the event vessel *lays up* in any Atlantic coast port, for any reason for which the crew is not responsible, crew to be paid up to the time the vessel lays up, and to be paid $125.00 additional in cash

in lieu of transportation, subsistence, lodging and wages back to the Pacific Coast." (Italics supplied)

Mike Kanary, Marshal N. Jones, Thad M. Barry, Lloyd David and Joseph Gilletti, assigned their claims to John Landro for the purpose of this libel.

■ After signing the Articles the crew elected their delegate. "A delegate of the crew is elected by the crew of each department to represent his department in any so-called differences that may come up" and is Spokesman for the crew of his department. The delegate gets his instructions from a majority vote of his department "called in a special, or any ordinary meeting." The duties of the Libellant and assignors on the ship consisted of cleaning up the ship, painting, scraping, clipping rust, handling gear, lowering gear, and keeping the ship up generally; and stand watches at sea. Jones left the ship voluntarily before reaching Philadelphia. He was taken to a hospital at Savannah, Georgia, because of sickness. The Steamship San Angelo arrived at Philadelphia, October 31st, between 7 and 8 o'clock A. M. "About six pickets were standing on the dock; might have been twelve."

The Libellant, his only witness, said in response to the enquiry "there wasn't any mob". The strike was on the West coast, called by Libellant's Union and affiliated Unions. "There was a picket line on the dock, they moved outside of the gate, but the picket line was there at all times composed of men varying from six to twelve men at a time." One in the picket line is a member of the Libellant's Union.

The seamen were "standing by" waiting for orders from the Boatswain, who get his orders from the Chief Mate; no one in the deck department worked on Monday. The Skipper brought the Deputy Shipping Commissioner on board, and he invited the crew who wanted to be paid off to come forward "to get their pay".

"Q. Tell the Court what happened to you when you went forward. A. As we went up to get paid off, we asked for our transportation which was to be one hundred twenty-five ($125.00) dollars, and in turn the crew refused to sign off without the $125.00; so part of us called up the delegate of the crew on the San Angelo that we were to meet in the office of the Shipping Commissioner at 10 o'clock next morning, and we all met there * * * and we were informed by the Commissioner

that he would not pay the $125.00 and would not pay without the crew signing off the release for the $125.00." The Deputy told them they might see the Commissioner at 10 o'clock the next morning.

The Shipping Commissioner testifies that the delegates came to see him.

"Q. How do you know that they were delegates from the San Angelo? A. Well they represented themselves to me as delegates on the part of the crew of the ship.

"Q. Was any reason given by the delegates as to why they desired to have the unlicensed personal paid off? A. I could not say if they made any statement of that sort, their chief reason was to get paid off; that they were on strike and that their Union had commanded them to leave the vessel.

* * *

"A. No! I can't say they did, I would say their own Union did, as they were seamen.

"Q. Did you have any discussion with these delegates as to whether they were, or not, wanting to work on the vessel? A. The discussion I had with them was with reference to their transportation back to the West Coast. They claimed that they were entitled to it because they were not leaving the vessel on their own free will; that it was on account of the Union that they were leaving. I told them at the time if they were a part of the Union, which they admitted, and if they left the ship, they could not expect their transportation back to the West coast. The entire crew was paid off in the office."

The Deputy Shipping Commissioner in response to a telephone call from the Steamship went to the vessel at approximately 4 P. M. on Monday. He copied the Pay Roll and then went to the Salon and sent for the crew to receive their wages. The first seaman called noted that transportation was not included and declined to sign; said he felt they were entitled to transportation back to the coast in view of a certain rider in the Shipping Article. "After the clause was brought up I asked to see the Shipping Article and noted there was a rider, that if the vessel *laid up* for any reason which the crew was not responsible for, they were to receive the sum of $125.00 in lieu of wages, transportation, subsistence back to the west coast. I told them they were at least partially responsible for the vessel laying up and in my opinion, they were not entitled

**540**

to transportation back to the west coast, but that if they wished to think it over they could talk to the Shipping Commissioner the following morning. I was given to understand no one was working except the cook who came out of the galley in my presence, in his regular working clothes; he called our attention to the fact that he was still working. This was the only man I saw still working and would not pay him off if he continued to work."

"Q. Did you have any discussion with any of the other members of the crew as to whether they were working? A. I recall asking the boatswain if he had quit work on the ship and he said 'yes' and his explanation was that when the vessel got here there was a picket in front of the Pier and according to Union rules he could not work back of the picket line.

\* \* \*

"A. There was a strike, yes.

"Q. Do you know whether the crew had joined with the strike? A. I was informed by the Master of the vessel that as soon as she tied up they refused to continue their duties."

The seamen appearing in the office, the Commissioner advised them that in his opinion they were not entitled to the amount stated on the rider of the ships Articles as he felt being members of the Union they were at least partially responsible for the ship being laid up.

"Q. After conference with the Shipping Commissioner what happened then? A. The delegates left the Commissioner's office and went back to where the remainder of the crew was waiting. They discussed the matter for a few minutes among themselves and then told me personally that they would take their wages. The Libellant and all assignors were then paid off.

"Q. What did they sign? A. They signed the Mutual Release form which all seamen when receiving their wages on the foreign intervoasted voyage sign.

"Q. Did any of the men you paid off enter a protest in signing? A. There is no protest on the Mutual Release sheet."

The conclusion is inevitable that there is no disclosure in the record showing that the crew left the ship for a reason for which they were not responsible. The vessel was not *"laid up"* as provided in the "rider" the only reason for leaving the ship was the fact that their Union was on strike on the West Coast. They were under the circumstances on strike. They left the ship without provocation, only a friendly gesture on the part of the pickets, some of which were from their own Union on the West Coast. The Libellant and assignors may not enter into a relation or status and by their own acts bring about conditions violative of their engagement in the Shipping Articles.

It is further obvious that they left after advice of the Shipping Commissioner, that the leaving of the ship would not entitle them to the transportation. And after conference of the delegates with the members of the crew, and after the suggestions of the Shipping Commissioner they returned and signed the Mutual Release. The Mutual Release signed releases the Master of the ship, owners and ship for all claims for the voyage. The issue involves: (A) applicability of Sec. 599 of Title 46 U.S.C.A. (B) Fraud or coercion in execution of the Mutual Release. No issue was tendered by the Libellant charging fraud in the execution of the Mutual Release nor is any fraud shown.

The Mutual Release is conclusive. There is a total absence of fraud or coercion in this record and the release is final (Title 46, U.S.C.A., Sec. 644, Subd. 2)

"Such release, so signed and attested, shall operate as a mutual discharge and settlement of all demands for wages between the parties thereto, on account of wages, in respect of the past voyage or engagement." The Aberdeen, D.C., 7 F. Supp. page 856 and cases there cited.

Decree of dismissal. This memorandum is the Court's Findings and Conclusions.

Proposed Findings and Conclusions if desired, may be submitted on notice to adverse party.