## MURPHY et al. v. AMERICAN MAIL LINE et al.

### No. 14691.

District Court, W. D. Washington, N. D.

Sept. 11, 1945.

Sam L. Levinson, of Seattle, Wash., for libelants.

Bogle, Bogle & Gates, and Thomas L. Morrow, all of Seattle, Wash., for respondents.

BOWEN, District Judge.

Action by members of the crew of the S. S. Richard Henry Dana to recover repatriation money for their return passage from New York to a Pacific Coast port. Libelants base their right to such recovery on the Shipping Articles calling for libelants' service on that vessel "now bound from the Port of San Francisco, California, to a point in the Pacific Ocean to the westward of San Francisco and thence to such ports and places in any part of the world as the master may direct * * * and back to a final Pacific Coast port of discharge in the United States, for a term of time not exceeding 12 calendar months."

In an earlier action brought on the same Articles by only two of the crew members to recover similar repatriation money and involving some issues common to this case, this Court decided in effect that the voyage in question which was commenced at San Francisco on September 16, 1942, under those Articles was terminated at New York on January 6, 1943, and that those two libelants were entitled to recover from respondent United States of America their repatriation money from New York to the Pacific Coast. Such decision in the former case was justified by the circumstances, among others, that the ship was at New York completely discharged and drydocked for overhaul and repair, and during her next two voyages, the last of which ended about March, 1944, the ship never did return to a Pacific Coast port for final discharge, but finally discharged at New York on each such subsequent voyage.

Further support of such decision in the former case is found in respondent's Exhibit A–12 in this case, which shows that the vessel, after completing discharge at 5:30 A.M., shifted to the Bethlehem yard in Brooklyn at 10:50 A.M. on January 5, 1943, for drydocking, thorough examination of rudder and post, wire brushing and painting of bottom, and for repairs or alterations in armament and in crew's quarters. In this connection it should be remembered that the crew signed off on January 6, 1943, but it can hardly be inferred that the prospect of such signing off inspired the thought of such drydocking for overhaul and repair the next day. Rather, from the shifting of the vessel to drydock

for such purposes so quickly after discharge of her cargo, it is more convincingly to be inferred that the vessel's operator had been considering the termination of the voyage before the crew decided to sign off, and that the breaking up of the voyage was intended and in reality caused by the drydocking, overhaul and repair of the vessel, not by the signing off of the crew.

■ From the evidence and disclosed circumstances, I find that at the time of planning the drydocking and repair, which was before the crew signed off, the vessel then intended not to return on that voyage to the Pacific Coast of the United States for final discharge; that the vessel then intended to embark upon a series of new Atlantic and other voyages from and to the Atlantic Coast of the United States; and that the holding up to the crew of the possibility of yet returning to a Pacific Coast port for final discharge within the 12-month period of the work contract was a pretense on the part of the vessel intended to mislead the crew as to the true intention of the vessel on that subject. The clearest signs present at the time strongly indicated that, and subsequent events as to the nature and extent of the overhaul and repair and as to the trading routes of the vessel convincingly prove it. The members of the crew were therefore justified in signing off the ship on January 6th, the day following the drydocking of the vessel, and in view of all these circumstances they did not give up their right to repatriation to a Pacific Coast port.

The evidence abundantly supports the contention of libelant crew members that, in addition to wages, they demanded repatriation money for their return passage to the Pacific Coast but were refused it and were refused their wages unless they signed a mutual consent release. Libelants further contend in effect that, although they finally signed that release, they did so under verbal protest pursuant to repondent's coercion because, after their demand for repatriation was refused, the only way they could collect their wages was to sign the mutual consent release exacted by respondent. This contention is likewise supported by the evidence.

■ Finally, the Court finds and concludes that the libelants were coerced into signing the release; that, because the release did not expressly acquit the obligation to pay repatriation money and because of such pretense and coercion, they did not

in fact or in law release respondent from its obligation to pay them repatriation money following failure in its duty assumed in the ship's articles to return libelants "back to a final Pacific Coast port of discharge" (see generally Brown v. United States, D.C., 283 F. 425, 427; Billings v. Bausback, 9 Cir., 200 F. 523); and that respondent is liable to pay to each of the libelants, except those shown by the evidence not to have incurred any such expense, as to which the burden is upon the respondent (48 Am.Jur. 114, Sec. 166; 15 Am.Jur. 770, Sec. 331), the reasonable cost of transportation of a person from New York to the Pacific Coast, which reasonable cost is hereby found to be the sum of $125.

This case is distinguishable from the case of Landro v. Pacific Atlantic S. S. Co., D. C., 30 F.Supp. 538, relied upon by respondent, because in the Landro case the libelant seamen were properly denied repatriation money claimed as a result of the termination of the voyage by a strike participated in by libelants.

Findings of fact, conclusions of law and decree will be settled upon notice or stipulation.